LIQUIDATING HOLDING CORP. *v.* MORTGAGE & CONTRACT CO.

1. CONTRACTS—DAMAGES—SUFFICIENCY OF EVIDENCE.

In action for interest on fund left with defendant as security for collections on large number of land contracts sold to it, and also for sums alleged to have been collected on other contracts left with it as security also, and wrongfully retained, judgment of $57,414.78 for plaintiff, *held*, not justified by record.

2. SAME—PENALTY—SECURITY.

 As guide to further proceedings, said security funds *held*, not created as penalty or forfeiture in event contracts defaulted, but solely as legitimate protection measure.

3. DAMAGES—PRECISE PROOF REQUIRED.

 When damages are susceptible of precise proof, facts showing such damages must be given.

4. APPEAL AND ERROR—NEW TRIAL.

 In case tried without jury and considered *de novo* by Supreme Court, which finds that judgment for plaintiff is not supported by testimony, case must be remanded for new trial.

5. COURTS—APPEAL AND ERROR—TRANSFER TO EQUITY SIDE OF COURT.

 While court of equity may be better forum in which to determine questions involved, nevertheless judgment may be obtained on complicated account in law action involving many issues, and therefore transfer to equity side of court should be had only if plaintiff's rights will not be jeopardized.

6. SAME—CONDITIONAL TRANSFER.

 On reversal of judgment for plaintiff in complicated case, on ground that judgment is not supported by testimony, case is remanded to court below for new trial, with leave to transfer to equity side of court on motion of either party, but if granted on motion of defendant it is required to give bond to satisfy any decree that may be awarded plaintiff.

Appeal from Wayne; Smith (Guy E.), J., presiding. Submitted April 26, 1932. (Docket No. 126, Calendar No. 36,455.) Decided June 6, 1932. Rehearing denied September 14, 1932.

Assumpsit by Liquidating Holding Corporation, a Michigan corporation, as assignee, against Mortgage & Contract Company, a Michigan corporation, for breach of contract relating to sale of interests in real estate. Judgment for plaintiff. Defendant appeals. Reversed and remanded.

*Shapero & Shapero* (*Harold M. Shapero*, of counsel), for plaintiff.

*Goodenough, Voorhies, Long & Ryan,* for defendant.

BUTZEL, J. Miller-Storm Company, Inc., herein referred to as "Miller-Storm," realtors and builders, acquired or erected over a considerable period of time a large number of medium-priced houses. They turned their capital by first securing mortgages on the houses, then selling them on land contracts with down payments and serial payments at regular intervals, and then finally discounting the equities with investors. In most instances the houses were sold to people whose ability to pay depended upon steady employment. In the fall of 1929, real estate values in Detroit had been steadily declining from the peak prices of former years and land contracts were becoming more speculative in character. This condition appears to have been reflected in the negotiations between Miller-Storm and defendant, the Mortgage & Contract Company, which culminated in the sale of 62 contracts by Miller-Storm to defendant, for the sum of $180,253.96, of which $50,000 was retained by defendant as partial security in accordance with the agreement hereinafter set forth. Assignments of the contracts, accompanied by warranty deeds, were delivered to defendant in each instance. The aggregate amount still due on the 62 contracts at the time of the sale was $562,500.02, from which the following amounts were deducted in the arrangement: $262,679.66 for first and $5,609.26 for second mortgages on the 62 parcels of property, $4,500 for the release of an additional mortgage, various sums for taxes, expenses, etc., the $50,000 security fund, and $102,358.83 as a discount to defendant. The method by which the discount was arrived at is in dispute. Under the

directions of Miller-Storm, $103,003.96 of the remaining $130,000 was paid to a lumber company which was pressing for payment, and the balance was paid to a trust company. Although Miller-Storm did not become surety for the payments on the land contracts, it did secure them in two ways: by leaving with defendant $50,000 of the purchase price as hereinbefore stated, and in addition thereto, by turning over to defendant 10 additional land contracts referred to as "B" contracts to distinguish them from the 62 contracts sold and identified as "A" contracts. The amount due on the "B" contracts after the deduction of mortgages aggregating $38,672.79 on the 10 parcels of property, was $43,956.04. The parties executed a written agreement, Exhibit "1" which is as follows:

"Agreement, made this 26th day of October, 1929, between Miller-Storm Company, Inc., a Michigan corporation, party of the first part, and The Mortgage and Contract Company, a Michigan corporation, party of the second part,

"Witnesseth as follows:

"(1) In consideration of $130,253.96, this day paid by second party to first party, first party hereby sells, assigns and transfers to second party all its right, title and interest in and to the land contracts described in the attached schedule marked Exhibit 'A,' and hereby delivers to second party separate assignments of said contracts and deeds covering the property described therein.

"(2) The amounts paid upon said contracts by the vendees named therein, or their assignors, fall short of sums which second party feels to be necessary as adequate security to insure the payment by the vendees or their assignees of the sums remaining due upon said contracts. It is therefore agreed that second party shall retain from the purchase

price of said contracts the sum of $50,000, paying 6 per cent. per annum semi-annually to first party as interest upon said sum, or such part thereof as shall remain with second party, and shall hold the same under the terms and conditions hereinafter set forth, and as further security for the faithful performance of said contracts by the said vendees or their assignees, first party hereby assigns and transfers to second party all its right, title and interest in and to the land contracts described in the attached schedule marked Exhibit 'B,' and hereby delivers to second party separate assignments of said contracts and deeds covering the property described therein, and it is agreed that second party shall hold the said contracts under the terms and conditions hereinafter set forth.

"(3) On the 1st day of May, 1930, and semi-annually thereafter, if the vendees named in the contracts described in Exhibits 'A' and 'B' or their assignees shall have at that time paid all instalments of principal and interest which have fallen due upon said contracts to a date 60 days prior thereto, and shall have also paid all taxes and insurance premiums which have fallen due during said period, second party shall remit to first party one-sixth of said fund of $50,000 until the entire fund has been repaid to first party. It is understood that the security of said contracts depends in part upon payments being made thereon by the vendees or their assignees, and that second party shall not be required to recognize contracts as not delinquent where part or all of the payments have been paid by first party in order to prevent said contracts from being termed delinquent hereunder. Second party shall make the collections on the contracts described in Exhibit 'B,' and on or before the 15th day of each month, commencing December 15, 1929, shall remit to first party all sums so collected up to the end of the preceding month with a statement showing the application of the same, except as hereinafter provided.

"(4) First party has the right to inspect the books and records of second party pertaining to said contracts from time to time for the purpose of learning the condition of contracts assigned.

"(5) In the event any of the contracts described in Exhibits 'A' and 'B' become in default prior to the 1st day of May, 1930, and remain in default for a period of 90 days, first party shall immediately substitute other contracts satisfactory to second party in place thereof, and after the said 1st day of May, 1930, in the event any of the contracts described in Exhibit 'A' shall become in default, and remain in default for said period of 90 days, second party shall become the absolute owner of one of the contracts described in Exhibit 'B,' second party having the right to make the selection of such contract to replace the contract so in default, and first party agrees to confirm such selection by giving second party a quitclaim deed to the property in question. In the event any of the contracts described in Exhibit 'B' shall become in default at any time, and shall remain in default for a period of 90 days, first party shall immediately substitute other contracts satisfactory to second party in the place thereof. First party shall have the right to withdraw any of the contracts described in Exhibit 'B' at any time upon substituting therefor other contracts satisfactory to second party. It is understood and agreed that inasmuch as second party has investigated the contracts described in schedules 'A' and 'B' to ascertain the security thereof, all substituted contracts must be satisfactory to second party and second party shall not be obligated to take any such substituted contracts unless it is satisfied with the security thereof. All contracts offered by first party to replace contracts in default shall be accompanied by an abstract of title certified to date, and all expense in connection with investigating such contracts and in having the title examined shall be paid by first

party, regardless of whether or not said contracts are accepted by second party. First party shall also pay all expense in connection with substituting such contracts. After such substitution has been completed the defaulted contract shall be returned to first party and second party shall reconvey the property embraced thereby to first party by warranty deed covenanting only against its own acts and subject to such incumbrances as are assumed by first party.

"(6) It is further agreed that in lieu of replacing any of the contracts described in Exhibit 'A' after such default, first party may purchase the same from second party at their face value less a *pro rata* reduction of the discount allowed second party on the date hereof in the proportion the time it would take to pay said contracts down to the mortgages now existing against the property in question, computed from the date of the default, bears to the time it would take to pay said contracts down to said mortgages, computed from the date hereof, assuming no extra payments were made thereon.

"(7) It is further agreed that in the event there is any default upon the part of the first party in making the substitution above provided for, second party may withhold remittances due first party from any source until the said default has been cured. It is further agreed that in the event any of the contracts described in Exhibit 'A' shall remain in default for a period of 60 days, second party may withhold remittances due first party.

"(8) In the event default is made by first party in replacing or purchasing contracts as above provided, second party, for the protection of the respective interests of the parties hereto, may commence suit against the vendees or their assignees for the collections of payments in arrears, or may serve notice of forfeiture upon said vendees or their assignees, and institute summary proceedings to re-

cover possession of the premises described in said land contracts, although it is expressly understood and agreed that second party shall be under no obligation so to do, and any such action on the part of the second party shall not be construed as a waiver of any of the rights of second party hereunder and shall not cure any default of the first party, and first party shall be liable for the expense of such proceedings and shall pay second party for any loss sustained by reason of the repossession of any such premises, and second party may deduct such expense, and any such loss from any money in its possession due first party and in addition the contracts described in Exhibit 'B' shall stand as security for the payment of any such expense or damage.

"(9) For the purpose of satisfying second party of the condition of title of the premises covered by the contracts described in Exhibits 'A' and 'B,' and to supply it with information upon which it may rely in purchasing the contracts described in Exhibit 'A,' first party and the officers executing this instrument on behalf of first party, represent that first party is the owner of the premises embraced by the said contracts described in Exhibits 'A' and 'B,' and that there are no incumbrances against the same except the first mortgages set forth in the warranty deeds delivered to second party, and that the amounts unpaid on the said contracts are as set forth in the schedules attached hereto, and further that all bills for labor and materials performed or furnished for the erection of the buildings upon said premises are paid."

Exhibit 1 does not completely define the rights and duties of the respective parties. There seems to be no provision for any substitution for "A" contracts that defaulted after May 1, 1930, and were in default for 90 days with the exception of certain provisions

regarding "B" contracts. The parties are not in accord as to what should constitute a default. The respective duties of the parties in making and enforcing collections are not provided for. While the agreement provides that "all substituted contracts must be satisfactory to second party and second party shall not be obligated to take any such substituted contracts until it is satisfied with the security thereof," the parties agree that approval of contracts offered in substitution could not be withheld for any captious or arbitrary reason. On the other hand, many elements may enter into the determination of the value of a land contract offered in substitution for a defaulted one. The financial responsibility of the vendee, the value of the land, the price for which it has been sold, the amount of the down payment and the unpaid balance, the amount of the serial payments, the character and condition of the house as well as its reproduction cost, the amount of the mortgage, the period for which it has to run and the payments to be made thereupon, must all be considered. Very many and serious defaults in the contracts occurred. Three of the class "A" contracts were in default at the time the agreement was executed. On May 1, 1930, it is claimed that "A" contracts, with equities totaling $66,000, were in default over two months. On October 1, 1930, according to defendant's figures, contracts with equities of over $65,000 were in default; plaintiff claims they amounted to only $26,000. The contracts seemed to become progressively worse. Miller-Storm offered defendant numerous replacement contracts from time to time. The claim is made that Miss Battelle, defendant's agent, who had charge of the defendant's contracts, was captious and arbitrary in her refusal to accept substitutions for de-

faulted contracts. It is further shown that Miller-Storm refused to turn over three contracts satisfactory to defendant in substitution for defaulted contracts. Plaintiff claims that Miller-Storm were not obligated to turn over their very best contracts to defendant. The proposed replacement contracts were at no time offered simultaneously. Testimony is not given in regard to each of these contracts and we cannot tell which contracts were arbitrarily refused.

It is further claimed by defendant that the discount was based upon the yield of the contracts, and that one providing for early mortgage maturities or amortization to be paid by the vendor should be sold at a larger discount than one where the mortgage payments may not become due until much later. It is apparent that the former ultimately would require a larger investment than the latter, and this may be a reasonable ground for dissatisfaction. Many other questions are raised by defendant. The record does indicate that in certain instances some of the contracts may have been summarily and arbitrarily rejected, despite Miss Battelle's statement to the contrary. Complete testimony, however, is necessary for the determination of all of these questions.

On February 25, 1931, defendant notified Miller-Storm that it had become the absolute owner of the "B" contracts, and demanded quitclaim deeds covering the properties. In reply, the attorneys for Miller-Storm asked whether defendant intended to return the class "A" contracts of the same amount as the class "B" contracts. Defendant thereupon announced that, inasmuch as Miller-Storm had not fulfilled the terms of the agreement, it would not return any of the defaulted "A" contracts, but would credit the hold-out account with the purchase price

of the "B" contracts, and that this was the only way to handle the matter, as there were insufficient "B" contracts to replace all of the defaulted "A" contracts. On March 12, 1931, Miller-Storm tendered quitclaim deeds of the properties covered by the "B" contracts and demanded the reconveyance of the defaulted "A" contracts with equities in the amount of the "B" contracts. One of plaintiff's attorneys saw Miss Battelle at that time, and she refused to accede to this demand. She stated that she would consult counsel and advise Miller-Storm if she should change her mind. She claims that no time was mentioned in which to give her reply. Plaintiff, however, claims that Miller-Storm were to be notified the following day. On March 19, 1931, Miller-Storm assigned its claim and all rights under the agreement to plaintiff, which instituted the present action on the following day. Under its declaration and bill of particulars, it seeks payment of interest on the $50,000 retained by defendant, two instalments of $8,333.33 each that would have become due on May 1 and November 1, 1930, if plaintiff was entitled to repayment, additional interest on these instalments, collections on the "B" contracts, interest on the collections, and 66 per cent. of the equities in the "B" contracts. It also asks for payments of some minor items which we shall not discuss, except to state that one is for $200 arising out of an acceptance letter on a Playview avenue contract which seems not to have been covered in the assignment by Miller-Storm to plaintiff. It is claimed by defendant that there is an error of $835.40 in plaintiff's computation. Questions arising in regard to these two latter items may also be answered on a new trial.

The plaintiff claimed that defendant was attempting to enforce a penalty or a forfeiture not contem-

plated by Exhibit 1, and that through its refusal to return the defaulted contracts in exchange for the "B" contracts, it had become liable in an amount equal to the value of the "B" contracts as well as for the semi-annual instalments and interest on the $50,000 deposit. The case was heard without a jury. The trial judge rendered a very brief opinion in which he stated that plaintiff was entitled to recover the full amount claimed, and rendered a judgment of $57,414.70 against defendant. Neither findings of fact nor law were requested or filed.

We would remand the case for the taking of further testimony, proper findings, and further briefs on the questions raised were we not of the belief that the matters in dispute can only be decided by full and complete testimony taken at a new trial. The various questions raised have not been answered to our satisfaction, nor do we believe that the judgment is justified by the record. It may be stated as a guide to further proceedings that the security funds were not created as a penalty or forfeiture in the event that the "A" contracts defaulted, but solely as a legitimate protection measure. On the other hand, were there some of the "A" contracts in default, defendant in turn should not be penalized by the loss of security intended for its protection under Exhibit 1. This does not, however, preclude plaintiff from recovering any damages to which it may be entitled through any wrongful action on the part of defendant, nor to a portion of the security should it be able to show a right to its return at the present time. In reversing the judgment, we have considered two questions:

1. Did Miller-Storm make such a tender of replacements of contracts as should have been satis-

factory to defendant and as should have cured the defaults in the "A" contracts so as to entitle plaintiff to the release of some of the moneys held as security?

2. What is the proper measure of damages for defendant's failure to return defaulted class "A" contracts to plaintiff upon the appropriation of the class "B" contracts?

In regard to the first question, we have assumed for the purpose of discussion only that Miller-Storm had the right to replace with new contracts class "A" contracts which defaulted after May 1, 1930. Inasmuch, however, as the agreement does not appear to confer any such right, we reserve opinion on this point and extend to the parties the opportunity to demonstrate to the satisfaction of the court that such a right did or did not exist, and if it did exist, to what extent. The testimony does not prove tender. While one witness testified that the contracts offered in exchange for defaulted contracts were of the same general character and covered the same type of property as the "A" contracts and the list of such contracts offered in substitution gives much information concerning the vendees and the mortgages, nevertheless, the evidence does not satisfy us that the contracts were such as defendant did not have a right to refuse. The testimony does not show the amount of specific contracts tendered at any one time nor does it prove that if defendant had accepted what in fairness it should have accepted, the defaults would have been cured. We might add, also, that there is a strong indication that some of the contracts were in fact equitable mortgages and could only be foreclosed in equity.

In answer to the second question, the agreement clearly contemplated that upon the appropriation of

class "B" contracts for defaults that continued for 90 days the corresponding defaulted class "A" contracts should be returned to Miller-Storm. This is provided for in section 5 of Exhibit 1. It may be that defendant is liable for the value of some defaulted class "A" contracts, but of what contracts? And to what value? While witness Storm testified that the defaulted class "A" contracts were worth at least 66 per cent. of their equities, this statement, even though uncontradicted, is not of sufficient probative force without further proof. When damages are susceptible of precise proof, the facts showing such damages must be given. *Meyers* v. *McQueen,* 85 Mich. 156; *Richards* v. *F. C. Matthews & Co.,* 256 Mich. 159.

Inasmuch as the case was tried without a jury and is considered *de novo* in this court, we must hold that the judgment is not supported by the testimony and the case must be remanded for a new trial. Plaintiff asserts in its brief that the controlling facts are not as complicated or as numerous as the record and briefs containing countless data would seem to indicate. To this we cannot subscribe. Defendant, on the other hand, asks that the case be transferred to the equity side of the court, where a proper account in regard to each parcel may be had, and the respective rights of the parties may be determined. As was said in *Butler Bros. Shoe Co.* v. *U. S. Rubber Co.,* 84 C. C. A. 167, 187 (156 Fed. 1):

"No action at law furnishes as efficient, practical, or adequate a remedy for the decision of such a controversy as a suit in a court of equity, which, with its deliberate methods, its power to select men trained in the science of accounting to take the evidence and state the result, its authority to consider and modify their reports after exceptions and hear-

ings, is alone really competent to justly determine such an issue."

While a court of equity may be a better forum in which to determine the questions in the instant case, nevertheless a judgment may be obtained on a complicated account in a law action involving many issues, and transfer should only be had if the plaintiff's rights will not be jeopardized. Securities have been deposited with the county clerk by defendant in order to release garnishment and to satisfy judgment. If by appropriate instrument, approved by the trial court, defendant will make such bonds secure also the satisfaction of any decree that may be awarded plaintiff, defendant may upon proper motion transfer the case to the equity side of the court where additional pleadings may be filed by either party so that all issues may be presented and determined as far as possible, and a multiplicity of suits be avoided.

The case is remanded to the trial court, and a new trial ordered. Either party may move for a transfer of the cause to the equity side of the court. Such motion must be made within 30 days of the time this opinion is filed, and if made by defendant, then only on conditions hereinbefore stated. Defendant will recover costs.

POTTER, SHARPE, NORTH, FEAD, and WIEST, JJ., concurred. CLARK, C. J., and McDONALD, J., did not sit.